We'll turn to our second argument set for today, Sinclair v. City of Seattle, case number 21-35975. Sinclair v. City of Seattle I'd like to reserve four minutes of rebuttal time. The district court prematurely and erroneously dismissed Donnitta Sinclair's 1983 claim with prejudice without the opportunity to amend for the city's destruction of the parent-child society and companionship with her son Lorenzo, who died as a result of the city's deliberate indifference manifested in its actions in the CHOP area of the City of Seattle in 2020. In an unprecedented action in any American city, the city officially and deliberately abdicated civil authority over a 16-block area of the City of Seattle, providing barricades to lawless individuals and other support that allowed those individuals to create a no-cop zone in which first responders would not enter without the police securing the area for those first responders. As a consequence, Lorenzo was shot and he was the subject of a failure on the part of Seattle Fire Department paramedics to come to his rescue by Seattle policy because the City of Seattle Fire Department would not respond in the absence of Seattle Police Department to control of the area. And that was the situation that they knew of. The paramedics knew of his distress, knew that he'd been shot, and they, after abandoning the city's East Precinct, the Seattle Police Department did not provide the kind of secure area for the Seattle Fire Department that allowed them to cross the barricades that had been erected in CHOP. So this is a, you have a sympathetic case here, for sure. But the thing that I'm struggling with is how your case fits within the case law discussing a particularized harm. It does for two reasons, Your Honor. And I think it's because the case is focused to some extent on the fact that Lorenzo was initially shot. But our case really revolves around two facts. He was shot, no question about that. And that was, we think that the individualized danger to him was the invitation that was in effect rendered to a 19-year-old special needs kid by the mayor of the City of Seattle and other responsible city officials that this was a block party. This was like the Capitol Hill block party, the pride parade, a summer of love, the mayor described it on CNN. So you have that one facet of the case, but you have the other facet of the case that is another deliberate indifference. Once he's there, once he's shot, the Seattle Fire Department, despite the fact that they knew he'd been shot, they were warned that he'd been shot, they did nothing. They stood idly by outside the barricades because of Seattle official policy that they would not cross the barricades of the no-cop zone that had been created in CHOP. So let's, I want to stop you for a minute. Let's set aside the deliberate indifference point and come back to particularized. Sure. So if your argument is that city officials made statements that made this area seem attractive and that people should come and see this. Correct. How is that particularized and how does that fit with the case law where we're talking about a specific person that has been identified as being at greater risk than the community at large? I'm still struggling with your theory because even under that theory, this particular individual who suffered harm was not at greater risk than anyone else who heard those reports and would have been enticed, if that's the right word, to come to this area. Well, for his shooting. And to use Judge Posner's observation, Bowers, I mean there's no difference between being thrown into the snake pit and being lured into the snake pit as the city of Seattle did in this particular case. But more to the point here, we don't know all of the circumstances. We have a circumstance where the city officials have apparently destroyed documents involving communications between the mayor, the police chief, and the fire chief as to what went on. What case says that a harm that applies to the community at large can be particularized? Well, we think it's akin to these cases that involve deliberate understanding that police officers are impaired and police officers are allowed to then go out and operate a vehicle and they encounter people and harm them. This was, I believe, discussed in Huffman. The Reed case out of the Seventh Circuit provides for that, and we provided by way of supplemental authority a couple of cases from the Second Circuit that have similar kinds of things. Knowing understanding that the individual is impaired, the state allows that individual then to go out and do what the individual does. You don't have to particularize the harm. It's a harm to the class of individuals encountered by that person under the circumstances. But wait, what class of individuals are you talking about? Just disability or you're saying anyone? People using the road. These are cases out of the Second Circuit and the Seventh Circuit where the officer impaired under those circumstances plows into pedestrians or plows into cars causing them harm. The state didn't particularize the harm to those individuals, but the class of individuals using the road were imminently foreseeable as to being harmed by an individual that was impaired. But let me also observe that in terms of particularized danger, with respect to the question of whether the Seattle Fire Department would cross the barricades, the particularized harm to Lorenzo is obvious. They're on alert. They're told he's been shot. He's dying. The officers, the Seattle Fire Department officers, and this is an excerpt of Record 45, actually contact their dispatch to make sure that they're not cleared to move into the location. Well, I don't think there's any dispute over the fact that the police department essentially abandoned the CHOP zone when they abandoned the East Precinct. I don't think there's any question, and the city doesn't really contest that the policy existed that the fire department would not enter and even officers would not enter unless there was a violent crime occurring. And in this instance, for reasons we have yet to fully understand, the fire department would not send the aid car in unless it had a police escort and there was a big confusion over where the aid car was stationed. So the policy existed, but I have the same concern with regard to the particularized harm here. I take your point, and I agree with it, that in the DUI cases, you may not know the name of the individual victim that's going to be hit by the drunk driver, but you know that anybody who's using the roads at that hour are going to be at increased risk of harm if the police let the driver continue on his way. So your theory here has to be that the city was deliberately indifferent to the rights of anybody inside the CHOP area who might become the victim of criminal acts when it made the deliberate decision to withdraw law enforcement from that area, thereby being willfully indifferent to the increased risk that the public faced. That's an accurate recitation, Your Honor, with respect to the fact that Lorenzo was shot. In the circumstance where Lorenzo is in CHOP, he is there and has been shot and needs emergency services, it's different. Individualized to him, that's the difference. The fact that he came to CHOP and was shot, I think it's analogous to those DUI cases that you talk about. But the difference is this additional factual pattern where he is shot, he is in need of emergency services. He's known to be in need of emergency services, and the fire department refuses to act because of city policy, the CHOP policy, gives you the individualized harm. This would be akin to Judge Zilley's reasoning in Hunter Capital that where we know the group of victim business owners whose businesses are being vandalized and targeted by the people inside the CHOP, that that was sufficiently particularized to indicate that they were placed at risk through the deliberate indifference of city officials who abdicated their responsibility to enforce the law. I think that's right, Your Honor. But in addition, you have two cases that I think speak loudly in this regard with respect to the fact that he's shot and has not provided services. Penea is the first. This is the individual who is ill. The police arrive at the house, they provide services to him, and for inexplicable reasons refuse to cancel a 9-11 call. The guy dies. You have Munger, the case of the individual who was drunk. The officers interact with him. They let him trail off into the distance, and he freezes to death. This is very akin to those circumstances. Or the Wood case where the state patrol left the woman stranded. Left the woman in the high-crime area at 2.30 in the morning, and she's raped. This is very akin to that. You had asked for judicial notice of the charter of the city of Seattle, but I was actually surprised that you didn't point us to Article VI, Section 1, that talks about the organization of the police department, and it says, and I quote, there shall be maintained adequate police protection in each district of the city, end quote. I mean, it seems to me they didn't do that in violation of the city charter. Not even close, and I'm aware of that charter provision. We didn't provide it. We were more we wanted to advise the court about the concerns that the portion of the charter that we quoted to the court to indicate. I guess the closest analogy I can think of is the oath that the president takes to see that the laws are faithfully enforced, and there's sort of a provision in the oath of office for city officials that kind of mirrors that, but it's not quite that specific. It is, and the troubling thing about this is this is a deliberate policy. I mean, your decisional law in the Ninth Circuit has spoken to the question about in terms of deliberate indifference. I mean, is this something that shocks the conscience, particularly in the context of a parental claim for loss of society and companionship, shocks the conscience. Your decision that you wrote in Patel and Judge Nelson, the decision that you wrote in Herrera, both speak to this. This is a different case. I mean, this is a case where the city knew what it was doing. They had ample time to deliberate and did deliberate. They made a series of conscious decisions, some of which were able to document, some of which were not because the documents may have been destroyed by appropriate city officials. You're basically going to get an adverse inference if you get that far. Class exploitation. Destroyed documents contained all sorts of smoking gun memos about, hey, we're putting all these people at risk, but the rights of the protesters are more important than the safety of the citizens who live and work there. Yeah, here we have something that was recited in our complaint, Excerpt of Record 45. Somebody in CHOP, some resident says, he's dying. They're advising them specifically about Lorenzo Anderson. He's dying. Sir, you've got to do something about this set of circumstances. And they call their dispatch to say, can we even go into that area, into the location as they described it? Can I take a step back to the beginning of who the proper plaintiffs are here? Because as I understand it, there was a claim by the decedent, by Lorenzo, and that's been settled, correct? That's correct. So this is the parent's claim. This is the mother. The mother's claim. And we asked for a supplemental briefing on this question. The Ninth Circuit does seem like an outlier here in recognizing 14th Amendment substantial due process, substantive due process claims for a parent over a non-minor child. Are you just saying we need to follow that, or would you actually defend that position from the Ninth Circuit if this were a question of first impression? I think other circuits have adopted the standard. This circuit has had that standard in place for 36 years. It's been applied in case after case after case by this court. It's been applied by the district courts throughout the Ninth Circuit. It would be entirely disruptive to the, you know, the decided jurisprudence of the court to all of a sudden decide. But none of those cases seem very well reasoned. In fact, it's not clear that the court ever adopted this rule actually thinking about it. It seems like we kind of backed into it, and then we've repeated those cases. But I can't find a case that applies more than a one-paragraph analysis of this question. And the question is, do we need to take a closer look at it? Because it does seem like these are materially different questions, whether, you know, from the individual who's actually harmed. Your Honor, I would argue that it makes sense. I mean, in traditional tort law, I mean, the court has struggled with this. Well, traditional tort law, I give you that. But traditional tort law is very different from constitutional. But the Constitution also recognizes the significance of the parent-child relationship. Where? You start with Stanley. No, that's not the Constitution. That's case law. The Supreme Court seems to be headed down a different road here where they're saying, where is this in the Constitution? If there's not a privacy right, as Dobbs has now said, under the Constitution, how is there an amorphous familial right for a parent over an adult child? Well, I think it's a clear-cut relationship that's been protected. I mean, it's central. It's one of those relationships. Point me to the constitutional provision that you would rely on if you were deciding this in the first instance that says that an adult child, that a parent has a constitutional right to damages to an adult child. I think you still start with the 14th Amendment and the substantive due process analysis. This is the type of relationship that's so fundamental to our society, and that's what substantive due process protects, fundamental kinds of relationships like the parent-child relationship, and it respects that. That's the core of it. That was the basis for the court adopting this position back in Strimberg 36 years ago. What about a 40-year-old child and a 60-year-old parent? Same analysis? Well, I think it still is a significant relationship, but here it's a 19-year-old and it's a special needs kid. What about siblings? Are we going to get claims from siblings in this case? Cousins? I think parent-child relationship. Close friends? Parent-child relationship, Your Honor, is pretty core. I mean, my relationship with my kids, your relationship with your kids, I think is a consequential one that the 14th Amendment protects and should protect, and this is one that should protect Anita Sinclair's right to her companionship and society with her son. Counsel, if we were to grant the relief you're requesting and reverse and remand, at least to permit you to amend your complaint, what amendments would you make in this 14th Amendment arena beyond what you've already said? Well, I think some of the things that would be amended, the court can take judicial notice of the fact that the Seattle inspector general issued a report about CHOP just a few days ago, and it's something about which we would plead in our complaint. But that goes back to the willful deliberate indifference by the city. I'm asking specifically with regard to the 14th Amendment. In terms of Danita's relationship with Lorenzo, we would document the nature of his special needs. He was a 19-year-old special needs kid. We would document what those special needs are. What was the disability? Well, I don't have a specific diagnosis of it. It was an attention deficit disorder of some sort, but we don't know. I can't tell you off the top what it is. I guess as a registered complaint it suggested that he was sort of easily influenced or led by others' suggestions. Yeah, and I think that's a... Does that play into the substantive due process issue? Like, would there be a difference? If we were not willing to go down and say that every adult child, a parent has a constitutional right for every adult child, was there something about this disability? Was he still living at home? Did he require care? I can't speak to that, Your Honor. That's something that we didn't develop in the complaint and would be something that would be developed in the complaint, I think, an amendment to the complaint. I guess the question would be, you know, did he belong to a vulnerable class such that his chronological age might not bespeak the actual mental acuities or abilities? And it may well be. We just haven't developed that, Your Honor. I don't know that off the top of my head as appellate counsel. But it's something that we would develop certainly in an amended complaint if given the opportunity to do so. That kind of relationship, I think, is significant. And to Judge Nelson's point, yes, indeed, it does narrow the scope of the circumstances dramatically. It's, you know, no different than circumstances where somebody who's incarcerated and mentally ill, the parents have stated a cause of action for that kind of loss of companionship. That would get you closer to that line of cases that talks about the special obligation that the state has to people who are in its custody. Correct. Inmates in prisons or people confined in mental institutions, that sort of thing. True. No question about that. But this is on a 12B6 review. We haven't had the opportunity to conduct discovery. We haven't had the opportunity to, you know, expand upon the circumstances of the relationship between Donita and Lorenzo, which we would in an amended complaint, and which we would upon appropriate discovery in the case. I note that I'm over my time. Thank you so much. This is an important case. We'll give you some time for rebuttal. Thank you, Your Honor. You might have to go down a little bit. I can't see her. Or we need to get a ladder in here. I didn't mean to do that. That's okay. Quite all right. We'll give her time to get it settled. Good morning. Kara LeCowart for the City of Seattle. This court can affirm the district court's order for any of three independent reasons. First, appellant fails to allege a constitutional deprivation because parents do not have substantive due process rights in the companionship of adult children. Kenneth, I appreciate your supplemental brief on this, but you seem to suggest that for us to rule in your favor on that, we would have to take this en banc. Do you see any avenue where we can distinguish a prior case law that seems to grant substantive due process rights to adult children? Your Honor, we read the cases as requiring the court to act en banc. However, earlier questioning by the court pointed to the Dobbs opinion, and Dobbs itself does strongly reinforce relevant principles from Supreme Court jurisprudence. So you'd say that we'd rely on Dobbs? I'm not sure that that was my suggestion, that it was intervening in Supreme Court precedent. We were not volunteering to boldly go where no panel has yet to go. The court's questioning also indicated that the previous Ninth Circuit opinions are not squarely decided. I thought you conceded that the only way we could get around extant case law was to go en banc. Are you backing off that position? No, Your Honor. The city reads the cases as saying that this court would have to go en banc. Okay. Go on to your number two. Yeah. So your objection is noted, but you concede that for the moment you're bound by existing Ninth Circuit precedent? Yes, Your Honor. All right. What's your second point? Appellant fails to allege that the city affirmatively created an actual particularized danger that her son would not otherwise have faced. And third, appellant fails to allege that the city acted with deliberate indifference toward the known or obvious danger. So can I ask about the particularized danger? Because you do a good job of citing these cases where, you know, they have to know about the specific individual almost or the specific danger here. But we've never seen a case like this. Has there ever been a case where a city has just said, we're not going to enforce the law? I mean, this was a group that came in and said, this is an autonomous zone, there are no laws here. And the city acquiesced in that, not only acquiesced in that, but applauded it and tried to invite people to come, sell tickets to a carnival, whatever it was. And then affirmatively aided it by supplying porta-potties and medical gear. Lighting. Yeah, lighting. They gave comfort to the enemy. I mean, this is really remarkable what the city did here. So why doesn't that just become so outrageous that, I mean, at some point it has to be so outrageous that you don't require an actual particularized knowledge of an individual. So at some level the risk has to become so great that the city has to bear some burden here. I think those questions go back to the Supreme Court's holding in Deshaney. The Supreme Court held that nothing in the language of the Due Process Clause requires the state to protect the life, liberty, and property of its citizens against invasion by private actors. The clause is phrased as a limitation on the state's power to act, not as a guarantee of certain minimal levels of safety and security. But it seems to me that Deshaney is different in that there was gross negligence on the part of the Child Protective Services to the reports of abuse that it was getting, and they kept returning the poor child to the home of the abuser. Here there is evidence, which we just recited, of active aiding and abetting of the lawlessness. And that seems to me to be a much more egregious case than what the Supreme Court dealt with in Deshaney. The facts are different, but the concern in Deshaney is that the court not the province of the legislature, and it's similar to the concern in Washington v. Glucksburg, where the court cautioned that when the court extends constitutional protections in a way that removes a debate from the public arena or from legislative action, then that is to be avoided. But as my brother, Judge Nelson, recited, your client did more than that. I mean, it essentially promulgated an official policy handed down from the mayor, endorsed by at least one member of the city council, who was quite outspoken on the subject, and apparently acceded to by a chief of police who also advocated her responsibility to enforce the laws, that the city was not going to enforce the criminal statutes inside the CHOP zone. Your Honor, that characterization, I believe, goes beyond what is alleged in the amended complaint here. I'm not so sure, counsel. I mean, I saw the allegations. I mean, admittedly, it's a complaint. You know, you'll get to it, but the allegations are in there. I mean, they stood up and said, the disconnect between the reality and what the politicians were saying is, I've never seen a case like this. Can you point us to a case like this where there was absolute anarchy? I mean, you've got to go back to, like, the founding era with, like, the Whiskey Rebellion or something like that. Like, I've never seen anything like this in America. And it's shocking that the city was just so ignorant of what was going on here. So why shouldn't they be held responsible for the harms? Why isn't this such a shocking outlier of a case that we would say, let's let the case go forward and see what the facts are? At least to summary judgment. I believe the principle, I believe that the court's concerns about decisions about the level of police response are legislative decisions. This was a complete abdication of the rule of law in favor of the law of the jungle. It violated the most basic responsibility of government to protect its citizens from harm. And I find it to be extraordinary that this happened. If I may address the specific allegations in the complaint. Here, there is no allegation that the city created an actual particularized procedure that appellate. They didn't create it in what way? Because they didn't actually invite them to, you know, down there, but once it happened, so the cases that you rely on are cases where there was a, there really was like, it really was like a party that got out of hand. Like there was a carnival and the police said, Hey, we're going to step aside. But those are like one instances in an evening that this is, this is something that was going on for weeks. And that, that that's what, I mean, what is the analogous case here? What do we look for? Because it just, I can't find one where the city was so aware of the risks that were escalating day by day by day. And they just stood aside. And the police chief was making statements at news conferences about, yeah, the crime rate has his shot out of the ordinary. Our response times are three times longer than they were when we occupied the East precinct. Clear indication that they knew what the consequences were of the policy that they had enacted. And if that isn't willful indifference, I don't know what is. The facts do not establish an utter abdication of police involvement in the chop. The allegations, I'm not sure how you can say, I mean, the allegations certainly say that. I mean, we, we, you know, two murders and I lost count of the numbers of shootings. You've got rapes, you've got assault. They gave barricade. What's the purpose of giving them barricade? Is it in the record that the, that police would not enter this zone for any reason ever? No, thank you, your honor. The, the amended complaint asserts that the city had a policy of entering in order to respond to life threatening crimes. Then why didn't the aid car enter the zone when people were literally knocking on the door, begging the fire department to come to the aid of this, this poor victim who'd been shot in the chest. The complaint alleges that city first responders did enter the zone. The complaint alleges that city first responders attempted to respond. 33 minutes later, after 20 minutes, your honor, your honor, the complaint alleges that they, a delay of 20 minutes was caused by your honor. The admitted complaint alleges that a delay of 20 minutes was caused by two things. First, a miscommunication between the police departments and the fire departments. And second confusion about his location. These type of allegations perhaps suggest negligence if accepted as true. However, they do not rise to the level of a constitutional tort. But how can we say that when some of the key evidence in the case is gone, it's been destroyed. I mean, you're going to have a real problem with an adverse inference that the jury will be told if this case gets to a jury about what those text messages actually show. Your honor, I'm focused on the allegations that are in the amended complaint. And I'm suggesting to you that there may be a strong adverse inference that will undercut the position that you're taking. And why shouldn't we allow the plaintiff to go forward in the face of these kinds of allegations? At this stage, even if all of the allegations in the complaint are accepted as true, it does not allege a state created danger. And if the court were to determine that it was a state created danger, then that would open up cities, states, governments to essentially unlimited. Well, okay, we'll back up. Let's, let's be precise. I'm not sure it opens up to unlimited. I agreed that this would be an extension of, of the case. But I'm trying to find the analogous case here, but unlimited. If we get to the point where this is, is going to apply to every city, then America is in big trouble because I've never seen, can you point me to any other case where the city has just abdicated responsibility over an area of the city and said, whatever goes goes, we're not going to enforce here. No, your honor. But if we're looking at the language of the 14th amendment, it does not guarantee that the state will provide police services. And although that may be, I understand. And that, and I agree with you, but that's different than what's going on here. This isn't just a failure to pull up, provide police services. This is actually aiding a rebellion. I mean, they came in and said, you know, this is an autonomous zone. There is no law here. And the city did nothing to stop that for a long period of time. I don't know how long this was, but they, they didn't do anything. In fact, the allegations are that these protesters were aided and abetted. They actually, the city actually allowed this to go on further and seemingly encouraged it to go on further. Your honor. I would like to address the enabling allegations. The fact that the city allegedly provided lighting and toilets cannot be a basis for a state created danger. They also provided concrete barriers, didn't they? A little later to close off streets that obviously would be a barrier to first responders who are trying to get in. Your honor. The complaint alleges that the city left behind traffic barricades and that private parties use those barricades to block traffic in some areas. There was an allegation. I think that was around the eighth of June, but later because the city didn't retake the area until what? The first part of July. So almost three weeks. Your honor. The appellant's brief alleges that the traffic barricades prevented first responders from reaching appellant's son, but that allegation is not in the complaint. And to the contrary, the complaint alleges that the factors that prevented a response were confusion over the location and a miscommunication between the fire and the police departments. And I do want to correct another statement made by appellant. The policy that's being pointed to in the amended complaint is not the police have made the area safe. That policy is nowhere discussed in here. And it wasn't a policy in any event specific to the chop. So why was it that the aid car crew was, was radioing the nine one one communication center asking for police protection before they were authorized to move in? Yes. Your honor fire department medics who are trained to provide emergency life-saving treatment are not trained to address. No, I understand. I understand. They don't have any way to protect themselves. That's why they need the police. And that particularly when they're going into an area that apparently is not regulated by law enforcement at all, as a result of the decision that's the city made. The amended complaint alleges that people regarded the chop as a quote, no cop zone. In quote, it does not allege that the city ever regarded it as such. And it does not allege that the police were not responding to life threatening crimes, but they were not responding to lots of crimes in the city in that zone where they weren't there. The allegation is that they responded only to life threatening crimes. And so the court could infer that they are not responding to property crimes. Right. So I'm trying to, in reaction to some of the questions brought up by my colleagues, how would we draw a line between this case and cases where that do exist where law enforcement knows about credible threats? We might say of domestic violence and yet do nothing. And yet we have said the fourth 14th amendment doesn't provide you a right there. So if we've said that in that context, which is a very specific, we have a targeted victim that we know is at risk and you don't have a right. How would we say that that's fine? But this is not, how would we draw a line between those two categories of cases where here is there a risk? Yes. I don't think we could, we could reasonably say no more generalized. We don't have a specific person identified. Um, how would we draw the line between those things? Your honor, all of the ninth circuit cases cited by either party uniformly involve a specific actions taken by government actors with respect to a specific defined group of people or individual. And the danger itself is concrete and particularized. Whereas the danger here is the danger of violent crime. And that is generalized and nebulous. So if they, if the city, would you be making the same? What if the city, uh, had, had handed out weapons to certain individuals in chop because they, you know, they said, look, this, we need some enforcers here and they'd handed out some weapons and that had, those weapons had been used. Would you, would you be making the same argument here where, look, they didn't, you know, we didn't take any, you know, we didn't actually do the shooting. Uh, but you know, we innate, would that in your opinion, not be enough for enabling if, if weapons were actually injected into the chop area? Well, your honor, lighting and toilets are very different from weapons. And no, I'm not making an argument about if a city official had handed a weapon. So at some point the city would have taken, you acknowledge that at some point the city could have taken affirmative action that would have, would have constituted, could have constituted a 14th amendment violation, but you're just saying here, it wasn't enough. Yes. Your honor. I'm not saying that the crap, a violent unruly crowd or a protest can never be the setting for a state created danger claim. I think the facts in Hernandez V city of San Jose are helpful because they establish that they demonstrate a situation where the city's actions did increase the risk of private violence. In that case, there was, um, a Trump rally and officers at the rally forced, they physically confined, forced, directed the rally goers to exit through a violent crowd of counter protesters. The officers who were there that night had either been personally informed of or actually witnessed the violence that was ongoing, being committed by the counter protesters against those who were exiting the rally. Counsel, how do you respond to the fact that after the second murder, which I think involved a 16 year old victim, and I believe he was shot by one of the guards, the private police force that was manning the barriers to enter into the chop zone. And chief Carmen best said a new, a news conference, I quote, it's unfortunate that we have yet another murder in this area identified as chop. And we've had multiple other incidents, assaults, rape, robbery, and shootings. So this is a real problem. And I would question why we could continue to allow this to happen and quote, and yet they continued to allow the zone to exist until July. Your Honor, I, I understand the court's concern. However, the Supreme court has held that the 14th amendment does not require states to provide a minimum level of security. These facts are tragic, but the 14th, I mean, people are dying council and not just one. I mean, at what point do we draw the line and say enough is enough? What happened here was totally unacceptable and there have to be consequences in the law, or we might not as well have no law at all. I believe the cases have drawn the line, Your Honor. And in the ninth circuit, that line is that there's a state created danger. Claim cannot go forward unless there are specific actions by government actors that place specific individual people in more danger than they would otherwise have been. And the danger must be actual and particularized and immediate. So the city's position is there is no legal remedy here. No, Your Honor, the, that's not the question being asked of the city. Well, you're asking us to affirm the dismissal of the complaint, which was with prejudice. That's the end of the case. Is it not? Are you saying there is a legal remedy here, but they just haven't pled it? No, Your Honor. The, I was referring there. The city's motion for judicial notice was granted that there has been a legal remedy to the estate. The question, though, is whether or not Mrs. Sinclair has a remedy. I, I'm not, the city is not going to take a position on the availability of state remedies. There is no federal constitutional remedy for this plaintiff in this case. Okay. Thank you. We'll give four minutes for rebuttal. That's what you'd ask for, I think. I'm going to do this again, I guess. Thank you for the opportunity for rebuttal, Your Honor. Just a couple of points that I wanted to make. In response to your question, Judge Nelson, there has never been a circumstance in American history where a city, has voluntarily, deliberately abdicated civil authority over a 16 block area of its responsibility. What's the solution to that problem in the ballot box? Why, I mean, Seattleites go and unelect these people that allowed this. Why isn't that the solution? Why should we as a court start monitoring police departments across the country? Well, that's, that's one solution, Your Honor, but you do monitor police departments when the police departments do something that's inappropriate under the constitution. And that's what happened here in the city of Seattle. Yes, but we have said in the fourth amendment content, or sorry, the 14th amendment context that domestic violence victims who are killed by their abusers and the police officers knew that they were at risk and did nothing too bad. You don't have a constitutional right to be protected all the time. I was going to point out that that's not exactly accurate because the, this court in the recent decision in Martinez versus city of Clovis basically did find that there was a circumstance where domestic violence, the situation was actionable in 1983. This was a recent decision of this court where the, the police officers basically made known the existence of a complaint by domestic violence victim to the perpetrator. And, well, but that makes it different. I think, I think judge forest comment is if you just know about the abuse going on, but here they actually took an affirmative step. Yeah. So in the Martinez case, they took an affirmative step to find someone. And I would question is, I guess whether the affirmative steps taken by the city here were enough to fit within that, that Martinez and that's, that's going to be. And that was what I was going to speak to in, again, in response to your question, judge Nelson, there's not a set of circumstances like this anywhere in America, anywhere you can point to an American history and council conceded that you've never had a circumstance where the city, in fact, not only, not only abandoned the area, it provided in effect, the concrete and wooden barriers that were then erected by these people to create a boundary around this zone. Another thing that I'm sure. And let me, let me be clear. I am not happy about what the city did here in any way. I think that any reasonable citizen wouldn't be, but the problem that I'm having is in all these other cases, government actors did something that made it so that the person who ends up being the victim has no choice to get themselves out of the harm, right? You know, they're stopped in their vehicles and pounded. They're left on the road in a high crime. There's nothing they can do about this sick circumstance that the government created for them here, regardless of how dangerous this zone was, there was nothing about the government forcing people to go there. Every person in Seattle could have just been like, we are not going anywhere near there. That is crazy. I'm not going there. You're on a response to that question. There was absolutely nothing, absolutely nothing that Lorenzo Anderson can do. Once he was shot, but he had the choice not to go there. There was nothing about what the government did to make him go there. Well, he made a choice. There was nothing about the, the, the victim and would being in that, in that vehicle. She was accompanying a drunk driver. There was nothing that made her accompany a drunk driver, but they, they stopped and then they turned the keys over there. It's not like they, right. Your, your point seems to be, even if we're not willing to go along with you on the enticement, the, the responsive, the, the response to the shooting is a separate action. Absolutely. And it is a separate action. You're on. It's a, it's a distinct and separate action. And to the point that the city made, Oh, we, we, we didn't have a policy. We pleaded that at excerpt of record 44 in paragraph 24 of the, of the complaint. We complained, we pleaded the Hunter's capital case incorporated by reference and in Hunter's capital at four 99 feds up third at nine Oh two. The court specifically said the strategy purportedly resulted in police and other emergency personnel, refusing to respond to nine one, one calls made from within or near chop. That is the essence of what we've talked about. And if we had the opportunity to, to amend our complaint, which we would hope to have the opportunity to do, the inspector general reported the city of Seattle made clear that they had a policy in place that the police, the fire department would not go into chop without the Seattle police department, clearing the area for them as we've argued today. So for all these reasons, we asked to have the opportunity at least to get to the summary judgment stage of, of proceedings, but to prove our case because Danita Sinclair has a 1983 claim for the loss of society and companionship of her 19 year old son. Thank you. Thank you. Thank you to both counsel for your arguments. In this case, the case has now been submitted.
judges: TALLMAN, NELSON, FORREST